IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **NATHANIEL POWELL, SR., et al.,** | * |
| *Plaintiffs*, | * |
| v. | *    **Civil Case No. 1:26-cv-00262-JMC** |
| **HARFORD COUNTY, MARYLAND** | * |
| *Defendant*. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Nathaniel Powell, Sr., individually and as the personal representative of the Estate of Nathaniel Maurice Powell, Jr., Demetria Burks, and NP, a minor child by and through mother, Michelle Nielson brought the instant litigation against Defendant Harford County on January 21, 2026. (ECF No. 1). Plaintiffs assert a single *Monell* claim against the County. *See id.* Presently pending before the Court is Defendant Harford County's Motion to Dismiss. (ECF No. 20); (the "Motion"). The Motion is fully briefed, and no hearing is necessary pursuant to Local Rule 105.6 (D. Md. 2025). For the reasons that follow, the Motion will be GRANTED without prejudice and with leave to amend.

## I.    BACKGROUND

This case arises from the allegedly preventable suicide of Nathaniel Maurice Powell, Jr. while he was a pretrial detainee in the custody of the Harford County Sheriff's Office (the "HCSO") at the Harford County Detention Center (the "HCDC"). (ECF No. 1 at 2).[1]

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. If there are none, the Court is referring to the page number of the PDF.

i.      Mr. Powell's Custody at HCDC

On January 18, 2023, Mr. Powell entered the HCDC facility as a pretrial detainee. (ECF No. 1 at 5). Plaintiffs allege that upon his entry, Mr. Powell received a screening performed by Licensed Nurse Practitioner Samantha Dougherty ("NP Dougherty"). *Id.* NP Dougherty's screening "noted several warning signs that put HCDC employees on notice that Mr. Powell Jr. was at risk of suicide and/or self-harm." *Id.* Plaintiffs allege those include notes indicating Mr. Powell suffered from substance abuse disorder and told NP Dougherty "he had been taking twenty (20) milligrams of Xanax every day, and ninety (90) milligrams of oxycodone every couple hours, every day." *Id.* "Mr. Powell Jr. stated that this substance abuse had been occurring for longer than one (1) year." *Id.* Plaintiffs assert that Mr. Powell was "noted to be actively withdrawing from substance abuse, and he reported that in the past such withdrawals had resulted in extensive tremors." *Id.* Notes further reflected that Mr. Powell "was concerned about losing his job, significant other, custody of his child (who he noted was one month old), and housing as a result of his arrest." *Id.* He also "reported that several friends and family had attempted and died of suicide. Mr. Powell Jr. expressed concerns about his ability to cope and emotionally manage the stress of his detainment to NP Dougherty." *Id.* at 5-6.

After the screening, NP Dougherty recommended a detoxification protocol for Mr. Powell's substance abuse and an "urgent referral" to Licensed Clinical Professional Counselor Loretta Himmler. *Id.* at 6. Plaintiffs allege Mr. Powell and Ms. Himmler met that same day. *Id.* Plaintiffs allege Ms. Himmler's assessment also reflected "several warning signs that put HCDC employees on notice that Mr. Powell Jr. was at risk of suicide and/or self-harm." *Id.* The alleged notes reflected that Mr. Powell suffered from substance abuse disorder "and told Ms. Himmler that he used (unprescribed) Benzodiazepine, Opiates, Heroin, and Alcohol daily." *Id.* Mr. Powell

indicated he previously sought inpatient and outpatient treatment for his substance abuse and that both sides of his family had a history of substance abuse. *Id.* Plaintiffs allege notes reflected "Ms. Himmler observed that Mr. Powell Jr. appeared to be intoxicated, depressed, and anxious during his intake." *Id.* "Mr. Powell Jr. reported the same during this intake and also told Ms. Himmler that he suffered from Post Traumatic Stress Disorder" ("PTSD"). *Id.* After their meeting, Ms. Himmler also recommended a detoxification protocol for Mr. Powell's substance abused and discussed the policy with him. *Id.* Plaintiffs assert Ms. Himmler scheduled a follow up appointment with Mr. Powell to occur within five (5) days after the "urgent referral" from NP Dougherty. *Id.*

Mr. Powell was placed in Cell R-17, which is not a suicide watch cell. *Id.* at 7. "Cell R-17 is located in a portion of the HCDC facility that is called the Restricted Housing Unit" (the "RHU"). *Id.* Plaintiffs allege Mr. Powell was "designated for thirty (30) minute well-being checks by HCDC staff." *Id.* They continue, "[o]n January 22, 2023, at approximately 12:15 PM, Mr. Powell Jr. was discovered unresponsive in his cell (R-17) by Correctional Deputy First Class Hunter Oleszczuk." *Id.* They assert that a "white bed sheet, torn and fashioned into a noose, was wrapped tightly around Mr. Powell Jr.'s neck. The noose was tied to the top bunk of his bunk bed, and suspended Mr. Powell Jr.'s slumped body in the air." *Id.* at 8. Plaintiffs allege a note in Mr. Powell's handwriting that expressed apologies and love to his family members was discovered lying next to him. *Id.*

Mr. Powell's body was discovered during a routine well-being check. *Id.* "The last well-being check conducted in the RHU before the discovery of Mr. Powell Jr.'s unresponsive body was alleged to have occurred approximately forty-five (45) minutes prior, at approximately 11:31 PM, on January 21, 2023." *Id.* Plaintiffs allege "The next well-being check should have been

3

conducted at approximately 12:01 AM." *Id.* Despite HCDC staff efforts to provide medical assistance for Mr. Powell, he was pronounced dead at 1:05 a.m. on January 22, 2023. *Id.* at 9. Plaintiffs allege that in the hour preceding the discovery of his body, "more than one witness—other detainees in the R-Dorm at the time of this incident—stated that they heard banging and yelling throughout the R-Dorm." *Id.* (citing ECF No. 1-1). They allege that "[t]hese witnesses have stated that this banging and yelling was an attempt to direct Correctional Deputies' attention to the fact that Mr. Powell Jr. was going to harm himself." *Id.* "The banging and yelling was witnessed to be coming from both other detainees in the RHU and from Mr. Powell Jr. himself." *Id.*

ii.    HCDC Policies

Plaintiffs allege that "[a]ny medical appointment scheduled to occur in five (5) or more days is characterized 'routine' according HCDC medical record keeping policy." *Id.* at 6. "However, this 'routine' follow up appointment was not 'standard procedure' within the facility." *Id.* (emphasis omitted). Plaintiffs allege that under the Harford County Detention Center Suicide Prevention Manual (the "Manual"), a "special watch of fifteen minutes or continuous staff observation may be in order" for detainees[2] withdrawing from heroin. *Id.* at 7. The Manual notes that "the single greatest indicator that a detainee will commit suicide is depression." *Id.* "The Manual further notes that depression, when combined with substance abuse, increases the risk of a suicide attempt on the part of a detainee, and that an individual under the influence drugs or alcohol is a 'very serious risk.'" *Id.* (emphasis omitted). Finally, Plaintiffs allege the Manual notes that such a risk increases throughout the withdrawal period. *Id.*

---

[2] Plaintiffs note that the Manual uses the term "detainee" throughout its policies despite certain procedural differences between a pre-trial detainee like Mr. Powell who had not yet been convicted of a crime and other detainees who are confined in a jail or prison as the result of the conviction of a crime. (ECF No. 1 at 7 n.1). As such, the Complaint uses the term "detainee" when referring to the Manual's policies.

The Manual states that "even if staff believes that detainees may be feigning suicidal ideation for attention, 'correctional officer[s] still [have] to act and proceed as if [the threat] is real . . .'"  *Id.* at 13.  "The Manual states that correctional officers should not become 'angry, judgmental, or threaten the inmate physically or verbally.'"  *Id.*

### iii.    The Alleged Pattern and Practice of HCDC

Plaintiffs allege that the Defendant's conduct in Mr. Powell's case is the result of an alleged "ongoing routine, systemic behaviors within HCDC that effectively abridge pre-trial detainees' Fourteenth Amendment and Article 24 rights to provide adequate screening, assessment, observation, care and treatment for those at risk for self-harm."  *Id.* at 12. "Additionally, pretrial detainees have been knowingly subjected to dangerous conditions which have facilitated and enabled instances of self-harm among at-risk individuals. These practices have resulted in a suicide rate five times the average rate across local jails in the United States, and in at least one known instance, the suicide of an incarcerated individual who was actively assigned to constant suicide watch."

As such, they assert that Sheriff Gahler, as "the final repository of the Defendant County's authority for the [HCDC], failed to enact or enforce policy."  *Id.* "Sheriff Gahler further failed to remove or modify known dangerous conditions from within HCDC that posed serious and credible threats to the lives and well-being of at-risk pre-trial detainees."  *Id.* at 12.  "By failing to take any action to prevent the known risks within HCDC, Sheriff Gahler fostered an attitude of blatant and deliberate indifference to the mental health needs and lives of detainees." *Id.* The alleged pattern involves a custom to "1) routinely placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen evaluate, and observe at-risk detainees; and 3) failing to remove known ligature points within HCDC cells."  *Id.* at 20.

Plaintiffs include in the complaint allegations illustrating examples of other detainees, both identified[3] and unidentified, who committed suicide in HCDC custody before and after Mr. Powell's death in a manner they assert is consistent with the allegations concerning the patterns at HCDC. *See generally* (ECF No. 1). "From 2019 to 2024, there were fifty-six (56) known suicide attempts in HCDC, with six (6) of those attempts being successful." *Id.* at 14. Plaintiffs allege that at least "twenty-nine (29) of these known attempts occurred in the [RHU]." *Id.* "The RHU portion of HCDC subjects pre-trial detainees, many of whom have just recently been booked into HCDC, to twenty-three (23) hours a day of lockdown isolation." *Id.* "Four (4) of the six (6) successful suicides occurred in the RHU portion of the facility." *Id.* at 14-15. Plaintiffs assert that each of the four successful suicides occurred in a similar manner, "with the pre-trial detainee using a bed sheet or article of clothing to tie a noose around the top bunk of the bed in their cell in order to hang themselves, and all of them designated to twenty-three-hour isolation." *Id.* at 15. "From March 9, 2023, through August 2, 2024, there were twenty-one (21) additional known suicide attempts in HCDC. Thirteen (13) of those attempts were known to have occurred in the RHU." *Id.* at 20.

### 1.    *Isolation*

Plaintiffs breakdown the precise allegations underlying the asserted pattern at HCDC, starting with isolation. *Id.* at 21. They assert that studies show "that isolation of detainees greatly increases the tendency that a detainee will commit self-harm." *Id.* (citing Kaba, Fatos et al. "Solitary confinement and risk of self-harm among jail detainees." American journal of public health vol. 104,3 (2014): 442-7. doi:10.2105/AJPH.2013.301742.). They allege that those

---

[3] These include Mr. Marylyn Williams Barnes, who died by suicide on April 10, 2019; Mr. Tommy Wayne Pardew, who died by suicide on May 1, 2019; Mr. Randy Craig Gisiner, who died by suicide on April 24, 2020; Mr. Jack Lazar who died as a result of suicide attempt injuries sustained on July 10, 2021; and Nathaniel Powell Jr. who died by suicide on January 22, 2023.

conclusions "are supported by data within HCDC, in which more than fifty (50%) percent of the known suicide attempts, and four (4) of six (6) known successful suicides, occurred while detainees were housed in twenty-three (23) hour isolation." *Id.* "Detainees were often assigned arbitrarily to twenty-three (23) hour isolation without being classified at HCDC immediately upon intake." *Id.*

### 2. *Evaluation, Treatment, Screening, Assessment, and Observation*

The second portion of the alleged pattern at HCDC concerns the evaluation, treatment, screening, assessment, and observation of detainees. *Id.* at 21. "Evaluation, treatment, screening, assessment, and observation policies for detainees who are at-risk of self-harm within the facility are inadequately enforced and/or created to ensure the well-being of detainees in HCDC." *Id.* Plaintiffs allege that this "is evidenced by both attempted and successful suicides which occurred in the facility" such as those illustrated in the Complaint. *Id.* at 21-22.

### 3. *Ligature Points*

Plaintiffs allege that the failure to make any changes to address the manner of the suicide attempts represents the third part of the custom at issue in this litigation. *Id.* at 23. "No less than thirty-four (34) of the fifty-six (56) known suicide attempts in the facility occurred because a detainee was enabled to fashion a ligature noose and fix it to a point inside their cell to hang themselves." *Id.* Plaintiffs assert that "[o]f these thirty-four (34) attempts, fourteen (14) of the known attempts involved a ligature noose being fixed to the top of the detainee's cell bunk." *Id.* They continue, "[t]he other fixed ligature hanging attempts are noted to have been fixed to bars within the cell, the feed port within the cell, and in one instance, to exposed wiring in the cell's ceiling." *Id.* "Four (4) of the successful suicides, which occurred over the span of three (3)

years, are known to have involved a ligature noose tied to the top bed bunk of the detainee's cell." *Id.*

Plaintiffs allege "Sheriff Gahler and Warden Galbraith have yet to take any action whatsoever to remove or modify these ligature points within the cells of HCDC, ligature points which are common to more than half of suicide attempts within the HCDC facility." *Id.* "Had they done so, it is more likely than not that lives of some or all of those detainees who died by suicide at HCDC would have been spared, and that many unsuccessful attempts would never have occurred." *Id.* They continue to assert that taking such action has been a possibility. *See id.* at 24. "Anti-ligature furniture and appliances have been in production and widely available for use in prisons for the past forty (40) years." Thus, they assert "Sheriff Gahler and Warden Galbraith, under their supervisory authority, could and should have taken initiative to acquire anti-ligature furniture (bunk beds) and modify or remove these and other fixed ligature points in HCDC. Failure to do so has only served to perpetuate deeply entrenched pattern of dangerous living conditions…" *Id.*

    iv.    The Alleged Relationship Between the Sheriff's Office and HCDC

"HCDC is entirely staffed, operated, and overseen by the Harford County Sheriff's Office." *Id.* at 24. "Every oversight investigation into an incident of self-harm at the facility is conducted by the Harford County Sheriff's Office." *Id.* at 25. The Complaint continues to assert in great detail the many ways in which the Plaintiffs assert that the HCSO conducted biased investigations in several of the specific suicide events described therein. *See generally* (ECF No. 1 at 26-28). Relevant here, Plaintiffs allege that Sheriff Gahler is the final repository of the Defendant County for HCDC. *Id.* at 29. They also assert that in addition to providing law enforcement functions, "the Sheriff's Office provides correctional services." *Id.* at 4. "In

operating and administering the Harford County Detention Center and supervising the personnel who perform those functions, the Sheriff is performing a local Harford County function." *Id.* They allege that the "Sheriff's Office is fully funded by Harford County" and "relies on County agencies including, for example, the Harford County Department of Human Resources to manage its benefits and the Department of Law to represent it in litigation." *Id.* They continue, "[t]he Sheriff's Office has an annual operating budget of approximately $120 million and employs close to 700 people." *Id.* They assert that the HCDC "and all of the precincts and facilities utilized by the Sheriff's Office are owned, maintained, and insured by the County" and "[a]ll of the equipment utilized by the Sheriff's Office is purchased with County funds." *Id.* "All of the vehicles utilized by the Sheriff's Office are purchased and maintained by the County and the fuel/gas for the vehicles is purchased with County funds." *Id.* "Harford County is a charter county that is expressly granted the power to establish, maintain, regulate and control county jails, and county houses of correction or detention and reformatories, and to regulate all persons confined therein." *Id.* at 4-5. As such, Plaintiffs allege that "Harford County is responsible for the policies, practices, customs, and regulations governing and used at HCDC and for the misconduct, acts, and omissions of its employees, agents, or servants." *Id.* at 5.

## II.    STANDARD OF REVIEW

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires

"more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp. 133, 136 (D. Md. 1995) (internal citations omitted). The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

## III.    ANALYSIS

Defendant County argues that the Complaint fails to state a claim because the alleged pattern is not attributable to the County.  (ECF No. 20-1 at 3).  They argue that in Harford County, "the provision of correctional services and the operation of the HCDC always have been State functions and services provided by State constitutional officers, i.e., the Sheriff and his deputies, including the Warden."  *Id.*  Here, the sole question for the Court's review is whether the allegations are sufficient to support an inference that Sheriff Gahler acted as a county employee.

Maryland law on this issue is well settled. In *Rucker v. Harford County*, the Supreme Court of Maryland recognized that sheriffs and deputy sheriffs are State employees as a matter of law.  *Rucker v. Harford County*, 316 Md. 275, 281 (1989). "The *Rucker* holding did not, however, foreclose that 'for some purposes and in some contexts,' a sheriff may be treated as a county employee, such as in matters related to the local funding and benefits of sheriffs' offices."

*J.A. v. Abreu*, Civil No.: 1:23-cv-02922-JRR, 2024 WL 3638023, at *3 (D. Md. Aug. 2, 2024). "The *Rucker* court further noted that its holding was limited to Maryland law only, and that 'whether the Sheriff and Deputy Sheriffs are to be regarded as State or local government employees, for purposes of the Eleventh Amendment or 42 U.S.C. § 1983, are federal law issues which are not before this Court.'" *Id.* In *Dotson v. Chester*, the Fourth Circuit considered the same question in the context of a § 1983 claim and held that *Rucker* did not "compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker." *Dotson v. Chester*, 937 F.2d 920, 926 (4th Cir. 1991). After *Dotson*, however, "federal courts analyzing federal law claims against Maryland sheriffs [generally] follow *Rucker* in holding that the sheriff acts as a state official when exercising law enforcement functions." [4] *Ledergerber v. Blubaugh*, No. CV JKB-20-966, 2020 WL 7029868, at *4 (D. Md. Nov. 30, 2020) (citing *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650-51 (D. Md. 2004). Similarly, despite the possibility raised in *Dotson*, Maryland has repeatedly dismissed county defendants "on the basis that sheriffs and deputy sheriffs are employees of the State under Maryland law." *J.A.*, 2024 WL 3638023, at *4; *see also S.D. v. Abreu*, Civil Case No. 1:25-cv-2985-JMC, 2026 WL 376741, at *10 (D. Md. Feb. 1, 2026); *Boas v. Graves*, No. CV TJS-22-0979, 2024 WL 1178186, at *7 (D. Md. Mar. 19, 2024); *Brooks v. St. Charles Hotel Operating, LLC.*, No. CV DLB-23-0208, 2023 WL 6244612, at *8–9 (D. Md. Sept. 26, 2023); *Collington v. Maryland*, No. GJH-20-966, 2021 WL 3172275,

---

[4] In support of the proposition that a sheriff's conduct cannot be attributable to the County, Defendant points to *Prince George's County v. Aluisi*. (ECF No. 21 at 12). There, the then Court of Appeals of Maryland reiterated the *Rucker* holding. *Prince George's Cnty. v. Aluisi*, 354 Md. 422, 434, 731 A.2d 888 (D. Md. 1999). Plaintiffs correctly state that *Aluisi* is a case that involved "funding the security and service of process," but the Court disagrees that *Aluisi* has no bearing here. *Id.* at 426. As *Aluisi* reiterated, Maryland "[s]heriffs and deputy sheriffs are state officials, not local government officials, and their duties are determined by state law, not locally enacted ordinances." *Id.* at 434 (citing *Rucker*, 316 Md. at 281-291). Thus, *Aluisi*'s analysis concerning the financial relationship between the State, the counties, and sheriffs illustrates Maryland's commitment to the general rule that sheriffs are state employees. *See id.* ("If any appropriate expense of a sheriff's office is not by statute specifically made the responsibility of the local government, the local government is not obliged to provide the funds, and the State may be responsible for making the payment."). To that extent, *Aluisi* carries some weight despite its publication in 1999. The Court agrees with Plaintiffs that more recent cases have further developed Maryland's approach to determining whether a county may be liable for a sheriff's conduct.

at *17 (D. Md. July 26, 2021); *Ledergerber,* 2020 WL 7029868, at *4–*Purnell v. Converse*, No. 1:21-CV-3202-JMC, 2022 WL 17552552, at *8 (D. Md. Dec. 9, 2022); *Sweitzer v. McGuinn*, No. CV GLR-17-1741, 2017 WL 4516711, at *4 n.13 (D. Md. Oct. 10, 2017); *McDonnell v. Hewitt-Angleberger,* No. CIV.A. WMN-11-3284, 2012 WL 1378636, at *4 (D. Md. Apr. 19, 2012).

In *J.A. v. Abreu*, this Court dismissed a county defendant from a suit involving a § 1983 and a vicarious liability claim based on a sheriff's alleged assaults on a civilian. *J.A.*, 2024 WL 4648023, at *4. In reaching its decision, the Court recognized that in an outlier case, *Santos v. Frederick County Board of Commissioners*, where a Maryland sheriff was considered a county employee because the claims involved turned on "a unique agreement whereby the federal government directly delegates its own plenary power over immigration by deputizing local political subdivisions to perform certain functions of an immigration officer." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 346 F. Supp. 3d 785, 794 (D. Md. 2018). The *J.A.* Court distinguished *Santos* because the complaint did not allege the defendant sheriff "possessed, or exercised, authority to make or enforce a County policy." *Id.*

To that end, Plaintiffs argue the Complaint properly pleads that Defendant controls HCDC. (ECF No. 21 at 21). Plaintiffs state,

> HCDC is entirely staffed, organized, and overseen by the Harford County Sheriff's Office. ECF 8-1, para. 45. Correctional staff members are considered "correctional deputy sheriffs," and ultimately serve at the pleasure and direction of Sheriff Gahler of the Harford County Sheriff's Office. *Id*. As noted above, Defendant Harford County provides sole operational funding for HCDC, has a role in the hiring of HCDC employees, and uses HCDC exclusively for all arrestees detained in Harford County. ECF 8-1, para. 46. Accordingly, Defendant Harford County operates HCDC. *Id*.
>
> Defendant Harford County also works with the Sheriff's Office to review policies and practices and provide risk management/incident review, workers' compensation, and related advice and counsel. ECF 8-1, para. 47.

12

(ECF No. 21 at 21).  Defendant argues that the Complaint lacks a factual basis necessary to state a claim because "[t]here are no pled facts that tether County policymaking with any of the aforementioned alleged unconstitutional acts or omission in this case."  (ECF No. 22 at 4).  This is true, and in *J.A.*, such omissions warranted dismissal of a county Defendant.  *See J.A.*, 2024 WL 4648023, at *4.  The Court further observes much discussion in Plaintiffs' opposition brief of facts not pled in the Complaint and therefore does not consider them at this juncture.[5]

Here, the parties make much of the statutory schemes that resulted in the creation of HCDC, County finance obligations,[6] and other code changes that took place after Mr. Powell's death.[7]  Against the backdrop above, however, the Court is most concerned with the allegations showing that Sheriff Gahler enforced or created County policy.  *See J.A.*, 2024 WL 4648023, at *4.  Defendant argues that the allegations such as "[e]very oversight into an incident of self-harm at [HCDC] is investigated by the Harford County Sheriff's Office…[and]…no independent law enforcement agency…has ever investigated any incident of self-harm in HCDC," and "When a

---

[5] A plaintiff cannot amend a complaint to add facts through motions briefing. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (indicating a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

[6] This argument has been foreclosed multiple times.  "[W]hether a county is financially responsible for coverage and defense costs based on a deputy sheriff's law enforcement related activities pursuant to Md. Code Ann., State Fin. & Proc. § 9-108, a provision regarding coverage and defense costs of sheriffs and deputy sheriffs, is a separate inquiry from whether a deputy sheriff is a State or county employee for liability purposes."  *J.A.*, 2024 WL 3638023, at *4 (citing *Barbre v. Pope*, 402 Md. 157, 181 n.18 (2007) ("[W]e have not equated provisions regarding the payment of MTCA judgments with authorizing separate tort actions."); *see also Boyer v. State*, 323 Md. 558, 573 n.10 (1991) (providing that "provisions regarding the payment of judgments, however, do not authorize tort actions against counties based on the negligence of State personnel acting within the scope of employment"). The Court observes that much of Plaintiffs' support for the proposition that § 9-108 creates a basis for liability comes not from Maryland case law, but rather from various articles or other fiscal session notes; while helpful, the Court does not find that such sources are of the type that would persuade the Court to deviate from such recent precedent as *J.A.* Similarly, *J.A.* recognized that where *Dotson* left an open door to the possibility that counties may remain defendants for a sheriff's conduct, the arguments there based on *Dotson* and § 9-108 were unavailing.  As such, *Monell* liability may not be imposed on the basis of § 9-108.

[7] Plaintiffs argue that the introduction of certain statutory changes and the accompany legislative history demonstrates that at the time Mr. Powell died, such changes evidence that the County was the proper defendant then. However, Plaintiffs did not bring suit until January 21, 2026, at which point all changes were in effect.  As such, the Court does not find the legislative development prior to and in the months following Mr. Powell's death a proper basis to deviate from Maryland's settled position on including county defendants in suits predicated on a sheriff's conduct.

death occurs in the HCDC, the same entity which is responsible for its operation staffing and oversight, the Harford County Sheriff's Office, conducts the investigation" undermine any argument that the County has some enforcement or policy shaping authority in this case. (ECF No. 1 at 24-25). The Court agrees.  The Court also agrees that the Complaint's details concerning the HCSO's final review power over the alleged suicides further supports the notion that the state maintains policymaking, control, and enforcement power over such occurrences. As such, the customs, policies, and practices at issue in the Complaint are not attributable to the County. Here, the facts pled in the context of a single *Monell* claim against the County are simply insufficient to impute liability to the County as a matter of law.  *See, e.g.*, *J.A.*, 2024 WL 3638023, at *4.  Accordingly, under Maryland's long history of dismissing county defendants on the basis of a sheriff's conduct, the Court must dismiss the Complaint.  Therefore, Defendant's Motion to Dismiss (ECF No. 20) is GRANTED without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, it is this 7th day of May 2026, hereby **ORDERED** that Defendant's Motion to Dismiss is GRANTED without prejudice and with leave to amend. Should Plaintiffs wish to file an Amended Complaint, they shall do so within twenty-eight (28) days of the date of this Memorandum Opinion and Order, at which time Defendant shall file an answer or other responsive pleading, including another motion to dismiss if appropriate, within twenty-one (21) days therefrom.

Dated: May 7, 2026                                              /s/

                                                        J. Mark Coulson
                                                        United States Magistrate Judge

14