## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**NATHANIEL POWELL, SR.,**
*Individually and as the Personal Representative*
*of the Estate of Nathaniel Maurice Powell, Jr.,*
2514 North Charles Street
Baltimore, Maryland 21218

     and

**N.P.,**
*A minor, by and through Michelle Nielsen, her*
*mother and next friend*
2514 North Charles Street
Baltimore, Maryland 21218

     and

**DEMETRIA BURKS**
2514 North Charles Street
Baltimore, Maryland 21218

     *Plaintiffs*,

     vs.

**HARFORD COUNTY, MARYLAND**
SERVE: Jefferson Blomquist,
*County Attorney*
220 S Main Street
Bel Air, Maryland 21014

     *Defendant*.

**Case No.: 1:26-cv-262**

**\* Jury Trial Demanded \***

## AMENDED COMPLAINT AND JURY DEMAND

     COMES NOW Plaintiffs, Nathaniel Powell, Sr., *Individually and as the Personal*

*Representative of the Estate of Nathaniel Maurice Powell, Jr.*, N. P.,[1] *a minor child, by and*

---

[1] N.P. is a minor child and shall be referred to moving forward in this case by this pseudonym to protect her privacy. Plaintiffs have provided the full name and identifying information for N.P. to the Court under separate cover.

1

*through Michelle Nielsen, her mother and next friend*, and Demetria Burks, by and through

attorneys Cary J. Hansel, Kristen M. Mack, and the law firm of Hansel Law, PC, and sues

Defendant, Harford County, Maryland, and as cause therefore state the following:

## INTRODUCTION

1. This action is brought by Plaintiffs as a result of the preventable suicide of

Nathaniel Maurice Powell, Jr. (hereinafter "Decedent" or "Mr. Powell Jr.") while he was a

pretrial detainee in the custody of the Harford County Sheriff's Office (hereinafter "HCSO") at

the Harford County Detention Center (hereinafter "HCDC").

2. Despite medical staff noting several warning signs that Mr. Powell Jr. was at risk

of suicide and/or self-harm and recommending detoxification protocol for Mr. Powell Jr., Mr.

Powell Jr. was housed in cell R-17 in the Restricted Housing Unit of the facility—which is a

normal cell with no restrictions—with no heightened level of observation, when he committed

suicide by hanging himself with a piece of ripped bed sheets.

3. Mr. Powell Jr.'s death is reflective of a past and ongoing systemic issue at HCDC,

which has a suicide rate five times the average rate across local jails in the United States.

4. Mr. Powell Jr.'s death was caused by the deliberate indifference,

unreasonableness, and negligence and/or gross negligence of the leadership at HCDC.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Honorable Court under 28 U.S.C. Code § 1331

because this is a civil action arising under the Constitution, laws, or treaties of the United States.

Plaintiffs further invoke supplemental jurisdiction of this Court to hear and decide claims arising

under state law, by virtue of 28 U.S.C. § 1367.

6.      Venue is proper in this Honorable Court under 28 U.S.C. §1391 because the parties are domiciled in Maryland, or organized under Maryland Law, and the events at issue took place in Harford County, Maryland.

7.      Defendant had actual or constructive notice of Mr. Powell Jr.'s death and the circumstances giving rise to Mr. Powell Jr.'s death within one year after Mr. Powell Jr.'s death, pursuant to the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc., § 5-304 (hereinafter "LGTCA"), and the Maryland Tort Claims Act, Sections 12-101 *et seq.*, of the State Government Article (hereinafter "MTCA"), and Plaintiffs are in full compliance with said Act insofar as it applies to the instant case.  All conditions have been fully satisfied precedent to filing suit.  Multiple incidents or occurrences as those terms are used in the relevant tort claims act are at issue in this case.

**PARTIES AND FACTS RELATED TO
DEFENDANT'S LIABILITY AND RESPONSIBILITY**

8.      Plaintiff Nathaniel Powell, Sr., (hereinafter "Plaintiff Powell Sr."), *Individually and as the Personal Representative of the Estate of Nathaniel Maurice Powell, Jr.*, is a surviving parent of Mr. Powell Jr., and was, at all times relevant to the occurrence complained of herein, an adult citizen of Edgewood, Maryland.  Plaintiff Powell Sr. brings this action in his individual capacity and as the personal representative of Decedent's estate.

9.      Plaintiff N.P., *a minor child, by and through Michelle Nielsen, her mother and next friend*, (hereinafter "Plaintiff NP") is the surviving child of Mr. Powell Jr., and her mother, Michelle Nielsen, was, at all times relevant to the occurrence complained of herein, an adult citizen of Edgewood, Maryland.

10.     Plaintiff Demetria Burks is a surviving parent of Mr. Powell Jr., and was, at all times relevant to the occurrence complained of herein, an adult citizen of Baltimore City, Maryland.

11.     Defendant Harford County, Maryland (hereinafter "Defendant County") is an entity of local government of the State of Maryland that, by virtue of the Maryland Constitution and the Harford County Charter, is a body corporate and politic which may sue and be sued.  The Harford County Sheriff's Office is the County's primary law enforcement agency.  In addition to providing law enforcement functions, the Sheriff's Office provides correctional services.  In operating and administering the Harford County Detention Center and supervising the personnel who perform those functions, the Sheriff is performing a local Harford County function.  The Sheriff's Office is fully funded by Harford County.  The Sheriff's Office also relies on County agencies including, for example, the Harford County Department of Human Resources to manage its benefits and the Department of Law to represent it in litigation.  The Sheriff's Office has an annual operating budget of approximately $120 million and employs close to 700 people. Harford County Detention Center and all of the precincts and facilities utilized by the Sheriff's Office are owned, maintained, and insured by the County.  All of the equipment utilized by the Sheriff's Office is purchased with County funds.  All of the vehicles utilized by the Sheriff's Office are purchased and maintained by the County and the fuel/gas for the vehicles is purchased with County funds.  County funds outside of the funds requested in the Sheriff's Office's operating budget are utilized to support the Sheriff's Office.  The Harford County Sheriff acts as the final repository of County authority and possesses final policymaking authority for Harford County in his operation of the Harford County Detention Center.  Furthermore, Harford County is a charter county that is expressly  granted the power to establish, maintain, regulate and

control county jails, and county houses of correction or detention and reformatories, and to regulate all persons confined therein.  As such, Harford County is responsible for the policies, practices, customs, and regulations governing and used at HCDC and for the misconduct, acts, and omissions of its employees, agents, or servants.

12.    As a Charter ("home-rule") county, Harford County is expressly granted the duty, under Maryland state law, to: "establish, maintain, regulate and control county jails, and county houses of correction or detention and reformatories, and to regulate all persons confined therein...." Md.Ann.Code art. 25A, § 5(C).  In its Charter, Harford County reserved for itself the full authority permitted home rule counties under state law.  County Charter, Section 101 (Harford County "shall have all rights and powers of local self-government and home rule as are now or may hereafter be provided or necessarily implied by this Charter and by the Constitution and laws of the State of Maryland. The County shall have all such rights and powers as completely as though they were specifically enumerated in this Charter, and no enumeration of rights or powers in this Charter shall be deemed exclusive or restrictive.").  Thus, Harford County was granted control of the Harford County Detention Center by State law and accepted that control under its Charter.  As such, Harford County is liable for the operation of its detention center and the misfeasance at issue in this lawsuit.

13.    Harford County's Charter expressly permits the County to delegate its authority over the detention center to an agent like the Sheriff: "[t]he powers mentioned in the preceding section shall be exercised only by the Council, the County Executive, and other officers, agents, and employees of the County acting under their respective authorities." County Charter, Section 102.  The Sheriff, Warden and Deputies whose actions are at issue in this case are agents of Harford County for purposes of operating the detention center.  The Sheriff, Warden and

Deputies are the final repository of Defendant Harford County's authority over the detention center. The Sheriff, Warden and deputies have the power to alter the legal relations of Defendant Harford County, as deputy sheriffs are authorized to conduct standard law enforcement and correctional activities that impact legal relations. As sworn officers conducting law enforcement and correctional activities, the Sheriff and his deputies are also obligated to act primarily for the benefit of Defendant Harford County and act according to law. Defendant Harford County has the right and ability to control deputy sheriffs, through the implementation of training and the payment of wages and benefits.

14. Harford County both has and routinely exercises the authority to regulate the conduct of the Sheriff and his deputies (like the Warden and other individual deputies). Under Harford County Code, Chapter 9, Part 3, Article XXII (§ 9-136), Harford County established the "Harford County Police Accountability Board," as authorized under Title 3 of the Public Safety Article of the Annotated Code of Maryland. "Members shall be appointed by the County Executive for terms coterminous with the County Executive and shall be confirmed by the County Council." *Id*. "The County Executive shall appoint, subject to a confirmation by the County Council, a member to serve as the Chair of the Board." *Id*. Under § 9-138 of the Harford County Code, the Board's "responsibilities and duties," include, "quarterly meetings with the heads of law enforcement agencies…to improve matters of policing….[a]ppoint[ing] civilian members to administrative charging committees and trial boards;"….[and] "[m]ak[ing] recommendations on changes to policy that would improve police accountability in the County." *Id*. This is one way in which Harford County maintains actual control and authority over the Sheriff, the Warden and the Deputies who work at the Detention Center.

15. Similarly, the "Police Commission" created and regulated by Harford County Code, Chapter 9, Part 2, Article III, has the power to "formulate recommendations to the County, state and municipalities regarding:….Uniform standards of performance and standardized operating procedures….", "[i]n-service training programs as required by the Maryland Police Training Commission and as recommended by the chief law enforcement officer of Harford County….," and "[u]pdating, planning and coordination of law enforcement policy changes." Through this Commission, Harford County maintains actual control and authority over the Sheriff, the Warden and the Deputies who work at the Detention Center. The Sheriff is explicitly designated as a member of the Police Commission: "The members of the Commission shall be the Sheriff of Harford County, who shall be Chairman of the Commission…"

16. Under the Harford County Code, Chapter 9, Part 3, Article XIIA, the County has established and regulates the "Harford County Administrative Charging Committee" for the purpose of "review[ing] the investigative files submitted by the appropriate law enforcement agency and mak[ing] a determination regarding administrative charging in accordance with the Public Safety Article of the Annotated Code of Maryland," and, "[o]n completion of the investigation by the appropriate law enforcement agency, the Committee shall review the investigation and determine whether the officer shall be administratively charged or not administratively charged." *Id*. "If the Committee determines that administrative charges shall be filed, the Committee shall make a disciplinary recommendation in accordance with the Uniform State Disciplinary Matrix developed by the Maryland Police Training and Standards Commission." *Id*. The "Harford County Administrative Charging Committee" includes, "[t]wo civilian members selected by the County Executive." *Id*. Through this Committee, Harford

County maintains actual control and authority over the Sheriff, the Warden and the Deputies who work at the Detention Center, including the ability to charge and discipline them.

17.     Defendant Harford County works with the Sheriff's Office to review policies and practices and provide risk management/incident review, workers' compensation, and related advice and counsel.  Harford County Sheriff's Office's Administrative Policy regarding Organizational Structure, issued August 25, 2021 and in place at the time of Mr. Powell's death, states that the "HCSO provides a wide range of law enforcement and correctional services within Harford County," including "pretrial and post-trial detention." https://harfordsheriff.org/wp-content/uploads/2018/05/ADM0201-Organizational-Structure.pdf (last accessed April 1, 2026).  The county-level functions of the Sheriff's Office include the Operations division of the Correctional Services Bureau—the entity receiving $34,016,369 in fiscal year 2024 from the county—which is responsible for "prevention of suicides" and "attempts to commit suicide." *Id*.

18.     Defendant Harford County controls the budget and appointment of sheriff's deputies: "[t]he Sheriff shall appoint the number of deputies at the compensation provided in the county budget." Md. Code, Cts. & Jud. Proc. § 2-326(d) (emphasis added).  In Harford County, Sheriffs and their deputies "have the right to organize and negotiate with the Harford County Executive and the Sheriff with regard to wages and employee health care premium share not regulated by the Sheriff." *Id*. at (i)(2), (j)(2).  In addition to wages and health care, Defendant Harford County is responsible for furnishing offices for the Sheriff as well as paying operating expenses.  Md. Code, Cts. & Jud. Proc. § 2-313(c).  Defendant Harford County effectively controls the detention center and is the primary source of funding not only for detention operations but also for the training of sheriff personnel.  In Harford County Bill No. 22-016, signed by the County Executive on June 23, 2022 and effective as of August 22, 2022, the

8

county borrowed funds to support its detention center operations and training. In particular, the bill included $20.5 million for the Harford County Sheriff's Office Central Precinct and Training Facility and $2.04 million for Harford County Detention Center Facility Repairs and Upgrades. In the Fiscal Impact Note to Bill Number 25-005, produced by the Office of the County Auditor for Harford County, Maryland, the Sheriff's Office is noted as receiving $34,016,369 in fiscal year 2024 from the county for the purpose of "provid[ing] local correctional services," out of an overall Sheriff's Office budget of $116,066,631 coming from the county.  This budget "includes funding for the Sheriff's Office Wage Package," in addition to funds for "medical services" rendered at the Detention Center, food service, safety equipment, janitorial and paper supplies, weapons and ammunition, equipment repair parts, printing, and A/V supplies, payment into the "Self-Insurance Fund," to cover judgment costs for cases such as this one, and funds "to further support behavioral health and substance abuse services, high-risk inmate medical monitoring, job re-entry training, and inmate transport assistance." By extreme contrast, the audit noted "[t]he budget includes anticipated State and Federal grants of approximately $1.2 million, which will require matching County funds of $282,000," a significantly lower sum than the funds provided by the county.  Defendant Harford County provides sole operational funding for HCDC, has a role in the hiring of HCDC employees, and uses HCDC exclusively for all arrestees detained in Harford County.  The county's contribution to the Sheriff's office dwarfs the State's contribution of $1.2 million, which represents only approximately 0.01% of the Sheriff's Office's total operating budget.  Defendant Harford County also controls services such as the Harford County Sheriff's Office Central Precinct and Training Facility and behavioral health and substance abuse services provided to detainees.   As the entity providing 99.9% of the funding for the Sheriff's Office and Detention Center, Harford County has the legal and practical ability to control the

9

operation of the Detention Center, as well as the non-delegable duty to exercise this control in way which would have prevented the death at the heart of this case.

19.     Under Md. Code, State Fin. & Proc. ("SFP") § 9-108, Defendant Harford County is liable for the misconduct of the sheriff and his deputies which is at issue here, as operation of a county detention center is a county function under the statute.  Under Maryland law, when "any sheriff or deputy sheriff" performs "detention center functions," including "operating and administrating a detention center" and "supervising personnel" associated with the detention center, the county is liable: "[a] county or Baltimore City may obtain insurance to provide the coverage and defense necessary under the Maryland Tort Claims Act," and if the county "does not obtain adequate insurance coverage to satisfy the coverage and defense necessary under the Maryland Tort Claims Act," then the remainder of the liability may be seized by the State from tax revenue or be subject to a warrant for payment. SFP §§ 9-108(a)(2); 9-108(c) & (d).

20.     On March 7, 2024, the State responded to Plaintiff's tort claims notice letter indicating that the County, and not the State, was liable for the claim which forms the basis of this lawsuit.

21.     Through State law, and the County Charter, Harford County has legal and practical control of the county detention center.  The County has legal and practical control over the Sheriff, Warden and Deputies insofar as the operate the detention center through County legislative and executive control of the detention center, Sheriff's Office and detention center policies, Sheriff's Office and detention center funding and the disciplinary process for the Sheriff, and his deputies, including the Warden.  Through this legal and practical control, Harford County could have met its duty and obligations to prevent the death at issue in this case, but the County failed to do so.

**ADDITIONAL FACTS**

22.     On or about January 22, 2023, Nathaniel Powell, Jr., (hereinafter "Mr. Powell Jr." or "Decedent") committed suicide in the Harford County Detention Center (hereinafter "HCDC").

23.     Mr. Powell Jr. entered the facility four (4) days prior to his death, on January 18, 2023, as a pre-trial detainee.

24.     Upon his entry into HCDC, Mr. Powell Jr. received a screening by Licensed Nurse Practitioner Samantha Dougherty (hereinafter "NP Dougherty").

25.     NP Dougherty's screening noted several warning signs that put HCDC employees on notice that Mr. Powell Jr. was at risk of suicide and/or self-harm.

26.     Mr. Powell Jr. was noted to suffer from substance abuse disorder, and told NP Dougherty that he had been taking twenty (20) milligrams of Xanax every day, and ninety (90) milligrams of oxycodone *every couple hours, every day*.  Mr. Powell Jr. stated that this substance abuse had been occurring for longer than one (1) year.  Mr. Powell Jr. was also noted to be actively withdrawing from substance abuse, and he reported that in the past such withdrawals had resulted in extensive tremors.  Further, Mr. Powell Jr. reported that he was concerned about losing his job, significant other, custody of his child (who he noted was one month old), and housing as a result of his arrest.  Mr. Powell Jr. also reported that several friends and family had attempted and died of suicide.  Mr. Powell Jr. expressed concerns about his ability to cope and emotionally manage the stress of his detainment to NP Dougherty.

27.     NP Dougherty recommended detoxification protocol for Mr. Powell Jr.'s substance abuse.

11

28.    As a result of this screening, NP Dougherty also recommended an "urgent referral" to Licensed Clinical Professional Counselor Loretta Himmler ("Ms. Himmler").  Ms. Himmler then met with Mr. Powell Jr. on that same day.

29.    Ms. Himmler's assessment noted several warning signs that put HCDC employees on notice that Mr. Powell Jr. was at risk of suicide and/or self-harm.

30.    Mr. Powell Jr. was noted to suffer from substance abuse disorder, and told Ms. Himmler that he used (unprescribed) Benzodiazepine, Opiates, Heroin, and Alcohol daily. Further, Mr. Powell Jr. told Ms. Himmler that he had previously sought both inpatient and outpatient substance abuse treatment, and that both sides of his family had a history of substance abuse.  Ms. Himmler *observed* that Mr. Powell Jr. appeared to be intoxicated, depressed, and anxious during his intake.  Mr. Powell Jr. reported the same during this intake and also told Ms. Himmler that he suffered from Post Traumatic Stress Disorder (hereinafter "PTSD").

31.    Ms. Himmler recommended detoxification protocol for Mr. Powell Jr.'s substance abuse and discussed said policy with him.

32.    Ms. Himmler also scheduled a follow up appointment to occur within five (5) days after this "urgent referral" regarding his mental health.  *Any* medical appointment scheduled to occur in five (5) or more days is characterized "routine" according HCDC medical record keeping policy.  However, this "routine" follow up appointment was not "standard procedure" within the facility and was particular to Mr. Powell Jr.'s mental health treatment.

33.     The Harford County Detention Center Suicide Prevention Manual (hereinafter the "Manual") recommends that "*a special watch of fifteen minutes or continuous staff observation may be in order*" for detainees[2] withdrawing from heroin.

34.     The Manual notes that the single greatest indicator that a detainee will commit suicide is *depression*.  The Manual further notes that depression, when combined with substance abuse, increases the risk of a suicide attempt on the part of a detainee, and that an individual under the influence drugs or alcohol is a *"very serious suicide risk."*  Finally, the Manual notes that this risk continues to increase during the withdrawal period.[3]

35.     Despite the numerous warning signs which posed risk to Mr. Powell's life, Mr. Powell Jr. was assigned to Cell R-17 without any heightened level of continuous or fifteen (15) minute observation.

36.     Cell R-17 is located in a portion of the HCDC facility that is called the Restricted Housing Unit (hereinafter "RHU").

37.     Mr. Powell Jr. was allegedly designated for thirty (30) minute well-being checks by HCDC staff.

38.     On January 22, 2023, at approximately 12:15 PM, Mr. Powell Jr. was discovered unresponsive in his cell (R-17) by Correctional Deputy First Class Hunter Oleszczuk (hereinafter "Deputy Oleszczuk").

---

[2] The Manual uses the term "detainee" in describing its policies.  A "detainee" is a broad term for anyone confined in a jail or prison, including people who have already been convicted and those awaiting trial.  A "pre-trial detainee" is a specific type of detainee who has been charged but not yet convicted and is being held while the case is pending.  For purposes of this Complaint, due to the terminology used in the Manual, the terms "detainee" and "pre-trial detainee" are used interchangeably to mean a pre-trial detainee.

[3] Harford County Detention Center: Suicide Prevention and Crisis Intervention Manual ML-01.

39. A white bed sheet, torn and fashioned into a noose, was wrapped tightly around Mr. Powell Jr.'s neck. The noose was tied to the top bunk of his bunk bed, and suspended Mr. Powell Jr.'s slumped body in the air. A red HCDC issued bracelet was on his wrist.

40. A note in Mr. Powell Jr.'s handwriting was allegedly discovered lying next to him on the desk in his cell. The note expressed apologies and love to various family members.

41. Deputy Oleszczuk discovered Mr. Powell Jr. during a routine "Well Being Check."

42. The last well-being check conducted in the RHU before the discovery of Mr. Powell Jr.'s unresponsive body was alleged to have occurred approximately forty-five (45) minutes prior, at approximately 11:31 PM, on January 21, 2023. The next well-being check should have been conducted at approximately 12:01 AM.

43. Deputy Oleszczuk's well-being check of the R-Dorm was approximately 15 minutes late.

44. Upon making this discovery, Deputy Oleszczuk issued an "all officers available call." Deputy First Class Morosko (hereinafter "DFC Morosko") responded first and checked Mr. Powell Jr.'s pulse. Detecting no pulse, DFC Morosko and Deputy Oleszczuk began performing CPR on Mr. Powell Jr. Registered Nurse Woods (hereinafter "RN Woods") soon after began administering oxygen to Mr. Powell Jr. while this occurred.

45. Concurrently, at approximately 12:19 AM, Sergeant Rossette ordered Sergeant Taylor to call Emergency Medical Services (hereinafter "EMS").

46. At approximately 12:21 AM, an Automated External Defibrillator (hereinafter "AED") was attached to Mr. Powell Jr.'s person. The AED advised no shock.

47.    Correctional and Medical Staff then alternated in performing chest compressions for approximately the next ten (10) minutes.

48.    At approximately 12:31 AM, Harford County EMS arrived at HCDC.  EMS thereafter took over CPR administration for Mr. Powell Jr.

49.    EMS attached tubes, an IV, and a compression machine to Mr. Powell Jr.'s person. EMS further administered Epinephrine (hereinafter "EpiPen") on three separate occasions during their life saving efforts.  DFC Morosko and Deputy Oleszczuk remained in Mr. Powell Jr.'s cell to assist EMS at this time.  Lifesaving efforts persisted for approximately thirty minutes after EMS arrived.

50.    Mr. Powell Jr. was pronounced dead at approximately 1:05 AM, on January 22, 2023.

51.    During the hour or so preceding Deputy Oleszczuk's late well-being check, more than one witness—other detainees in the R-Dorm at the time of this incident—stated that they heard banging and yelling throughout the R-Dorm.  *See* Exhibit 1 (Baltimore Banner Article). These witnesses have stated that this banging and yelling was an attempt to direct Correctional Deputies' attention to the fact that Mr. Powell Jr. was going to harm himself.  *Id.*  The banging and yelling was witnessed to be coming from both other detainees in the RHU and from Mr. Powell Jr. himself.  *Id.*

52.    Mr. Powell Jr. had to: handwrite a lengthy suicide note; then strip the bedsheets; tear the bedsheets; then tie and weave the bed sheets together so that they were long enough to create a noose; then tie the bed sheets to the top bunk of his bed; and then he had to hang himself through the process of strangulation as opposed to breaking his neck, which takes much longer.

15

Mr. Powell Jr. had to do all of this while undergoing detox and while looking out for people walking by, which would significantly add to the length of time that all this would take.

53.     Had Deputy Oleszczuk responded to the detainees' calls for attention to Mr. Powell Jr.'s condition, and/or conducted his well-being check in a timely fashion, it is more likely than not that he would have discovered Mr. Powell Jr. while Mr. Powell Jr. was in the process of hanging himself, and Mr. Powell Jr. would still be alive today.  Such a breach constitutes negligence, gross negligence, deliberate indifference, and/or an intentional violation of Mr. Powell Jr.'s rights.

54.     As a direct and proximate result of Deputy Oleszczuk's actions, Mr. Powell Jr. suffered significant physical pain and suffering, including, but not limited to, suffocation, panic, and, ultimately, loss of life.  Plaintiffs have also suffered severe emotional pain and suffering, including, but not limited to, grieving over the preventable loss of Mr. Powell Jr.'s life, loss of sleep, anxiousness, extreme sadness, and loss of enjoyment of life, as well as significant economic damages.

55.     HCDC is entirely staffed, organized, and overseen by the Harford County Sheriff's Office.  Correctional staff members are considered "correctional deputy sheriffs," and ultimately serve at the pleasure and direction of Sheriff Jeffrey Gahler (hereinafter "Sheriff Gahler") of the Harford County Sheriff's Office (hereinafter "HSCO").

56.     Defendant County provides sole operational funding for HCDC, has a role in the hiring of HCDC employees, and uses HCDC exclusively for all arrestees detained in Harford County.  Accordingly, Defendant County operates HCDC.

57.     As outlined above, Defendant County provides approximately 99.9% of the funding for the Sheriff's Office and Detention Center. By contrast, the State's contributions

16

amount to only 0.01% of the total operating budget. The budget funds provided by Defendant County include, but are not limited to, funds for employee wages and healthcare, for the training of sheriff employees at the Defendant County-funded Central Precinct and Training Facility, facility repairs and upgrades for the Detention Center, funds for medical services provided to inmates at the Detention Center, food service, safety equipment, janitorial and paper supplies, weapons and ammunition, equipment repair parts, printing, A/V supplies, and funds for the "Self-Insurance Fund" to cover judgment costs for suits against the Sheriff's Office. The funds provided by Defendant County to the Sheriff's Office also include funds specifically designated "to further support behavioral health and substance abuse services, high-risk inmate medical monitoring, job re-entry training, and inmate transport assistance."

58.     In addition to full financial control, Defendant County has legal and practical control of the Detention Center through its adoption of the authority to control the Detention Center under the County Charter and its implementation of commissions such as the Harford County Police Accountability Board, the Police Commission, and the Harford County Administrative Charging Committee, which exercise practical authority and control over the operation of the Detention Center. Indeed, Defendant County has explicitly appointed the Sheriff to serve as the chair of the Police Commission.

59.     Furthermore, using its legal, practical, and financial control, Defendant County works with the Sheriff's Office "to review policy and practices and provide risk management/incident review, workers compensation, and related advice and counsel."[4]

60.     Accordingly, by virtue of this legal, practical, and financial control, which Defendant County both held and exercised, Defendant County operated the Detention Center and

---

[4] *See* https://www.harfordcountymd.gov/427/Law-Department (last visited December 17, 2025).

was responsible for the unlawful, inadequate, and unconstitutional policies and procedures outlined herein.

61.    In addition, Defendants County and Sheriff Gahler are both at least partially responsible for the policies of HCDC, and Defendant County is fully responsible for the conduct of their employee at HCDC.

62.    For the reasons outlined above, including, but not limited to, by virtue of Defendant County's legal, practical, and financial control over the Detention Center and designation of the Sheriff to manage such functions, the Harford County Sheriff acts as the final repository of county authority for the Harford County Detention Center.

63.    Warden Galbraith (hereinafter "Warden Galbraith") is and was at all times relevant to this incident the Warden of HCDC.

64.    Sheriff Gahler is the final repository of Defendant County's authority/the final county policymaker regarding correctional services at the Harford County Detention Center.  As such, Defendant County is liable for claims against Sheriff Gahler and his deputies arising from correctional services at HCDC—Defendant County's own website acknowledges this.[5]

65.    Sheriff Gahler breached his duty to properly supervise the HCDC employees and staff within the state and federal constitutional limits of their authority, which led Deputy Oleszczuk to believe that he could fail to perform the required well-being checks of Mr. Powell Jr. in a timely manner, and which led HCDC staff to believe that they did not need to properly designate and/or provide an adequate treatment/observation protocol to protect Mr. Powell Jr.'s well-being.  Such a breach constitutes negligence, and/or gross negligence, and/or an intentional violation of Mr. Powell Jr.'s rights, and/or a malicious violation of Mr. Powell Jr.'s rights.

---

[5] *Id.*

**The Patterns and Practices of the Harford County Detention Center**

66.     The Defendant's conduct, and the harm which befell Mr. Powell Jr. as a result of such conduct as alleged herein, is reflective of past and ongoing routine, systemic behaviors within HCDC that effectively abridge pre-trial detainees' Fourteenth Amendment and Article 24 rights to provide adequate screening, assessment, observation, care and treatment for those at risk for self-harm.  Additionally, pretrial detainees have been knowingly subjected to dangerous conditions which have facilitated and enabled instances of self-harm among at-risk individuals. These practices have resulted in a suicide rate five times the average rate across local jails in the United States, and in at least one known instance, *the suicide of an incarcerated individual who was actively assigned to constant suicide watch*.

67.     For the reasons outlined above, including, but not limited to, by virtue of Defendant County's legal, practical, and financial control over the Detention Center and appointment of the Sheriff to manage such functions, Sheriff Gahler is the final repository of Defendant County's authority for the Harford County Detention Center, and in his position of supervisory authority over the staff members of HCDC, Sheriff Gahler failed to enact or enforce policy, and/or conduct training to adequately ensure that pre-trial detainees were properly screened, assessed, housed, and treated to prevent instances of self-harm.

68.     Sheriff Gahler further failed to remove or modify known dangerous conditions from within HCDC, that posed serious and credible threats to the lives and well-being of at-risk pre-trial detainees.

69.     By failing to take any action to prevent the known risks within HCDC, Sheriff Gahler fostered an attitude of blatant and deliberate indifference to the mental health needs and lives of detainees.

70.     This attitude is not only demonstrated by policy and training failures of Sheriff Gahler in allowing numerous suicides/attempted suicides to take place, but also in the HCDC correctional staff behavior towards at-risk detainees.

71.     The Manual states that even if staff believes that detainees may be feigning suicidal ideation for attention, "correctional officer[s] still [have] to act and proceed as if [the threat] is real . . .." The Manual states that correctional officers should not become "angry, judgmental, *or threaten the inmate physically or verbally*."

72.     Notwithstanding this guidance from the manual, HCDC correctional staff have often chosen to intervene by force instead of using de-escalation techniques or involving mental health staff during critical self-harm incidents.

73.     One such occasion of forceful intervention occurred on June 20, 2022.  On this day, an (at this time) unknown detainee was observed tying a blanket to the bars in an apparent attempt to take his own life.  Instead of involving HCDC mental health professionals or attempting to use proper de-escalation techniques to remove dangerous personal items which could be used for self-harm, correctional officers opted for a forceful approach.  A team in full tactical riot gear, complete with full armor and riot shields; prepared themselves to breach the cell in order to collect these personal items.  The deputies thereafter violently charged into the cell striking this detainee with the shields and pinning him against the wall so they could handcuff him.  Once restrained, the deputies used shears to cut the clothing off if his body and removed the rest of the dangerous property from the cell.  The detainee was threatened with taser deployment if he did not comply.

74.     The Manual further states, that even if staff believes that detainees may be feigning suicidal ideation for attention, "correctional officer[s] still [have] to act and proceed as if [the threat] is real . . .."

75.     One example of threats being disregarded occurred on September 28, 2022.  On this day, an unidentified detainee who had displayed concerning mental health issues was found with a string tied tightly around his neck.  His face was noted to have been purple due to restricted circulation.  In the reports written on this incident, correctional staff opined that the attempt had not been a legitimate threat.  Two weeks later on October 10, 2022, this detainee, *despite having been placed on suicide watch*, was allowed to make another serious attempt on his life, which resulted in his transport to Upper Chesapeake Medical Hospital (hereinafter "UCMC").

76.     Warden Galbraith's stated belief is that suicide prevention policy is redundant.  "If somebody want to kill themselves, they're determined and they've made their mind up, *they're going to find a way*."  *See* Exhibit 1 (Baltimore Banner Article).  The Manual directly addresses and contradicts this notion, stating that the belief that "[s]omone who is really intent on committing suicide cannot be stopped" is actually a <u>myth</u> regarding self-harm.  The Manual further states that, in actuality, "[m]ost suicidal people want to be rescued."

77.     Attempted and successful suicides in HCDC bare remarkable similarities to one another, both in the manner of which they occurred, and the warning signs which preclude their occurrence.  Such similarities point towards the preventability, not the inevitability, of self-harm in HCDC.

78.      "Correctional officers are responsible for preventing suicides—both legally and morally" according to the Manual.

79.     From 2019 to 2024, there were fifty-six (56) known suicide attempts in HCDC, with six (6) of those attempts being successful.  At least twenty-nine (29) of these known attempts occurred in the Restrictive Housing Unit ("RHU").  The RHU portion of HCDC subjects pre-trial detainees, many of whom have just recently been booked into HCDC, to twenty-three (23) hours a day of lockdown isolation.  Four (4) of the six (6) successful suicides occurred in the RHU portion of the facility.  All four (4) of the known RHU suicides occurred in a similar manner, with the pre-trial detainee using a bed sheet or article of clothing to tie a noose around the top bunk of the bed in their cell in order to hang themselves, and all of them designated to twenty-three-hour isolation.

80.     All instances of attempted or successful suicide in HCDC, where an investigation by a law enforcement agency was deemed necessary, were investigated by law enforcement deputies of the Harford County Sherrif's Office.

81.     All six (6) of the known pre-trial detainees who died by suicide during the 2019-2024 time-period in HCDC had been in the facility for ten (10) days or less.

82.     One of these pre-trial detainees, Marylyn Williams Barnes, who died by suicide on April 10, 2019, had only been in the facility for a single day.  Mr. Barnes family was never informed of the details relating to his death.

83.     Another pre-trial detainee, Tommy Wayne Pardew, who died by suicide on May 1, 2019, was designated for constant suicide observation when he succeeded in taking his own life. Mr. Pardew used his pants to fashion a noose to kill himself.  According to news sources, observation footage showed Mr. Pardew practicing how to hang himself in the time leading up to his death.  HCDC personnel members assigned to constant observation either failed to observe this behavior or failed to report such.  Suicide protocol requires the assigned nurse to periodically

22

log detainee activity while performing observation.  On the day Mr. Pardew died, the assigned nurse logged a *false* entry.  The entry claimed Mr. Pardew was lying in his bunk alive, when instead he was actually, according to footage—hanging by his neck from that same bunk.  His suicide was discovered over thirty (30) minutes after it occurred despite 'constant observation.' Mr. Pardew used his pants to fashion the noose.  HCDC policy requires pre-trial detainees under suicide watch to be issued a suicide smock, and for all other personal belongings which could potentially inflict self-harm be removed from the cell.  Mr. Pardew had been in the facility for less than a week.

84.    It was known that Mr. Pardew was at risk for self-harm; his death was preventable.

85.    On April 24, 2020, Randy Craig Gisiner similarly took his own life in HCDC by hanging himself from a bed sheet fashioned into a noose, attached to the top bunk of his bed in the RHU.  Upon entering the facility on April 16, 2020, Mr. Gisiner was placed on *suicide watch* and designated for fifteen (15) well-being checks of his person.  Pre-trial detainees who are designated for suicide observation are required to be on *continuous* observation for twenty-four (24) hours per day.  Mr. Gisiner was subsequently and inexplicably transferred to the RHU and redesignated for one (1) hour well-being checks.  His cell in the RHU had known ligature points which posed an obvious danger to suicidal detainees.  The HCSO investigation into Mr. Gisinser's death <u>claimed</u> that there were "*no signs that detainee Gisinser was distressed or upset about anything.*"

86.    It was known that Mr. Gisiner was at risk for self-harm; his death was preventable.

87.     After Mr. Gisiner's death, there were twelve more suicide attempts in HCDC before the next successful suicide.

88.     One of those twelve attempts occurred on October 17, 2020.  On this day, an unidentified detainee, who was designated to a *special confinement cell* in the RHU, asked a correctional staff member for razors.  Detainees are designated for placement in special confinement cells for the safety of themselves, other detainees, and HCDC staff.  The specific reason for this detainee's placement in a special confinement cell is unknown at this time.  The involved correctional staff member stated in their incident report that there was nothing in the logbook that indicated this detainee was on a "no sharps" order.  Fifteen (15) minutes later the detainee had slit his wrists, and his cell was soon after steeped in blood.  At some point after slitting his wrists, the detainee had smeared the blood into a message on the wall of his cell.  Although the criminal investigation division of the HCSO was called to investigate the matter, no documents and/or information was provided to Plaintiffs regarding this incident in response to a Maryland Public Information Act (hereinafter "MPIA") request asking for such information.  The detainee ultimately survived the attempt and upon returning to the facility was placed on suicide watch.

89.     On July 10, 2021, Jack Lazar attempted to take his own life by hanging himself from a bed sheet fashioned into a noose attached to the top bunk of his bed in the RHU.  He was thereafter intubated and transported in critical condition to Upper Chesapeake Medical Hospital (hereinafter "UCMH").  Days later he succumbed to his injuries, dying on July 14, 2021.  Mr. Lazar had come to the facility only seven (7) days prior to his suicide attempt on July 3, 2021.  This was Mr. Lazar's first time being incarcerated, and he was awaiting extradition to Pennsylvania.  He was scared, unable to contact his family, and communicated such to HCDC

staff.  Mr. Lazar, upon entering the facility, was placed on fifteen (15) minute heightened watch due to his medical/psychological history.  On July 6, 2021, Mr. Lazar's heightened watch designation was inexplicably changed from fifteen (15) minutes to thirty (30) minutes.  Later that same day, for a medical/psychological reason, Mr. Lazar was taken to UCMH for the first time.  On July 7, 2021, Mr. Lazar returned to HCDC, where his watch designation was not reduced, altered, or made to be continuous despite his recent trip to the hospital.  On July 9, 2021, Mr. Lazar was taken to medical due to his medical/psychological condition, in addition to mental pressures of his confinement, which had continued to cause him distress.  The next day, July 10, he attempted to take his own life.  The HCSO investigation into his death claimed "*[t]here were no notes or any indicators/evidence that would have explained why Detainee Lazar would have wanted to harm himself*."

90.    Mr. Lazar was at known risk for self-harm; his death was preventable.

91.    On June 27, 2022, an unidentified detainee attempted to take his own life by hanging himself from a bedsheet fashioned into noose in the "B-Block" of HCDC.   During the investigation into the incident, the unidentified detainee's cellmate was interviewed.  The cellmate told investigators that HCDC psychologists had refused the unidentified detainee several requests to be seen for a mental health sick call.  The cellmate further told investigators that when psychologist finally met with the unidentified detainee, the detainee was told that the HCDC psychologist could not help him.  The detainee told investigators that in the days leading up to the unidentified detainee's suicide attempt, the unidentified detainee had drawn several graphic pictures of a figure being hung from a tree.  The pictures had been *posted onto the cell door by the detainee so that they could be seen by HCDC staff*.  The pictures, a suicide note, and the bed sheet were recovered from the cell and submitted into evidence.  The detainee survived

the attempt, but in the redacted investigation report, it appears that investigators elected not to interview the detainee. While the HCSO investigation report does not attempt to claim an absence of self-harm indicators, the *incident report authored by responding <u>HCDC</u> staff* told a different story. Departing from the HCSO investigation narrative, the HCDC incident report failed to mention the graphic pictures at all. Further, the HCDC incident report does not mention the suicide note, at least not explicitly. It only claims that a "letter" was "confiscated" upon the detainee's transportation to a nearby hospital—but makes no reference to its contents. Finally, the <u>HCDC</u> incident report boldly claims that the detainee "***showed no signs of wanting to commit suicide***."

92.     Warden Galbraith was present in the cell of the above attempt for at least twenty-five (25) minutes while the aforementioned investigation took place.

93.     On January 22, 2023, Nathaniel Powell took his own life in HCDC by hanging himself from a bed sheet fashioned into a noose, attached to the top bunk of his bed in the RHU. Mr. Powell Jr. was heavily detoxing from opiates and alcohol at the time of his death. Mr. Powell Jr. self-reported and was observed to be experiencing depression, PTSD, anxiety, and extreme distress regarding the ramifications of arrest to/by medical staff. HCDC staff nevertheless failed to put Mr. Powell on any heightened watch. Four (4) days later Mr. Powell Jr. died by his own hand. When HCSO investigators conducted interviews, staff members told investigators that Mr. Powell Jr. did not make any statements that HCDC staff considered "concerning" regarding his potential for self-harm.

94.     It was known that Mr. Powell Jr. was a risk for self-harm; his death was preventable.

95.    On March 9, 2023, an unidentified detainee took his own life in HCDC by hanging himself from a bed sheet fashioned into a noose, attached to the top bunk of his bed in the RHU.  HSCO deputies were dispatched to the facility in response to a "cardiac arrest" and were not told of the suicide attempt until they arrived at HCDC.  The unidentified detainee had entered the facility only five (5) days prior, on March 4, 2023, for a violation of probation, and was immediately placed in twenty-three (23) hour isolation upon his arrival.  The unidentified detainee had met with mental health professionals twice in these five (5) days and at the time of his detainment in HCDC was actively *withdrawing from substance abuse*.  The HCSO investigation concluded that the reason for the suicide attempt was due to the unidentified detainee "being confined/lack of knowledge about the status of his criminal case."

96.    It was known that this unidentified detainee was a risk for self-harm; his death was preventable.

97.    From March 9, 2023, through August 2, 2024, there were twenty-one (21) additional known suicide attempts in HCDC.  Thirteen (13) of those attempts were known to have occurred in the RHU, which mandates those housed there to twenty-three (23) hour a day isolation.

98.    Despite obvious warning signs which accompany high rates of self-harm amongst a specific category of detainees held within HCDC, the patterns, practices, and policies of the facility have remained unchanged.

99.    These patterns, practices, and policies of HCDC are unconstitutional, and violate the Eight and Fourteenth Amendments of the United States Constitution.

100.    The duration and frequency of these unconstitutional patterns, practices, and policies were, and are, so widespread and persistent within HCDC that they constitute a custom

so widespread as to have force of law.  These customs include but are not limited to: 1) routinely placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen evaluate, and observe at-risk detainees; and 3) failing to remove known ligature points within HCDC cells.

101.    HCDC maintained these customs, policies, and practices by knowingly, consciously, and repeatedly failing to correct the widespread pattern of unconstitutional conduct, which caused Mr. Powell Jr.'s rights to be violated, and ultimately resulted in his death.

102.    This unconstitutional conduct continues to pose unnecessary and preventable risks which threatens the well-being of pre-trial detainees housed in HCDC.

**Isolation**

103.    Studies[6] on suicide rates in correctional facilities have concluded that isolation of detainees greatly increases the tendency that a detainee will commit self-harm.

104.    These conclusions are supported by data within HCDC, in which more than fifty (50%) percent of the known suicide attempts, and four (4) of six (6) known successful suicides, occurred while detainees were housed in twenty-three (23) hour isolation.

105.    An unidentified detainee who attempted to take his own life on April 16, 2024, told HCSO investigators that his placement in isolation drove him to make the attempt on his own life.

106.    Many of the detainees placed in isolation were pre-trial detainees who had just entered the facility and had yet to have been convicted of any crime.  Further, many detainees who attempted and/or successful suicide had been housed in the facility for less than ten (10) days and presented symptoms/behaviors which indicated that they were at-risk for self-harm.

---

[6] Kaba, Fatos et al. "Solitary confinement and risk of self-harm among jail detainees." *American journal of public health* vol. 104,3 (2014): 442-7. doi:10.2105/AJPH.2013.301742.

28

107.    Detainees were often assigned arbitrarily to twenty-three (23) hour isolation without being classified at HCDC immediately upon intake.

**Evaluation, Treatment, Screening, Assessment, and Observation**

108.    Evaluation, treatment, screening, assessment, and observation policies for detainees who are at-risk of self-harm within the facility are inadequately enforced and/or created to ensure the well-being of detainees in HCDC.  This is evidenced by both attempted and successful suicides which occurred in the facility—discussed more fully *supra*—such as:

a.    Failing to prevent Marylyn Williams Barnes successful suicide.

b.    Failing to prevent Tommy Wayne Pardew's successful suicide while on suicide observation.

c.    Failing to prevent Randy Craig Gisiner's successful suicide while on suicide observation.

d.    Giving razors to a detainee designated for special confinement, who fifteen (15) minutes thereafter used the razors to slit his wrists.

e.    Failing to prevent Jack Lazar's suicide attempt (which led to his death) despite his designation for heightened observation.

f.    Failing to prevent the attempted suicide of an detainee who was denied access to mental health professionals, who, when given access to mental health professionals, was ultimately given nothing to help his condition, who, in the days preceding his suicide attempt, posted multiple pictures depicting figures committing suicide on his cell door.

g.    Failing to prevent Nathaniel Powell's Jr.'s successful suicide, who self-reported and was observed to have symptoms of depression, PTSD, anxiety to/by HCDC

staff; and who was known to be actively detoxing from high volumes of opiates and alcohol.

h.      Failing to prevent a detainee's successful suicide, which occurred approximately two (2) weeks after Mr. Powell Jr.'s, who, like Mr. Powell Jr., was actively detoxing from substance abuse and had met with Mental Health professionals in the days leading up his death.

109.    The incidents mentioned above are non-exhaustive and could have been prevented by the enforcement/creation of policy and/or procedures regarding proper evaluation, treatment, screening, assessment, and observation of at-risk detainees.

**Ligature Points**

110.    In addition to failing to recognize and rectify known patterns of placing detainees on twenty-three (23) hour isolation, and failing to enact and/or enforce policy regarding the proper evaluation, screening, treatment, and observation of at-risk detainees, Sheriff Gahler and Warden Galbraith failed to enact any changes to address the *manner* of suicide attempts which are most prevalent in the HCDC facility.

111.    No less than thirty-four (34) of the fifty-six (56) known suicide attempts in the facility occurred because a detainee was enabled to fashion a ligature noose and fix *it to a point inside their cell* to hang themselves.  Of these thirty-four (34) attempts, fourteen (14) of the known attempts involved a ligature noose being fixed to *the top of the detainee's cell bunk*.  The other fixed ligature hanging attempts are noted to have been fixed to bars within the cell, the feed port within the cell, and in one instance, to exposed wiring in the cell's ceiling.  Four (4) of the successful suicides, which occurred over the span of three (3) years, are known to have involved a ligature noose tied to the top bed bunk of the detainee's cell.

112. Upon information and belief, Sheriff Gahler and Warden Galbraith have yet to take any action whatsoever to remove or modify these ligature points within the cells of HCDC, ligature points which are common to more than half of suicide attempts within the HCDC facility. Had they done so, it is more likely than not that lives of some or all of those detainees who died by suicide at HCDC would have been spared, and that many unsuccessful attempts would never have occurred.

113. Anti-ligature furniture and appliances have been in production and widely available for use in prisons for the past forty (40) years. Sheriff Gahler and Warden Galbraith, under their supervisory authority, could and should have taken initiative to acquire anti-ligature furniture (bunk beds) and modify or remove these and other fixed ligature points in HCDC. Failure to do so has only served to perpetuate deeply entrenched pattern of dangerous living conditions, which continues to threaten the safety and well-being of all detainees housed in HCDC. Had these changes taken place, several suicides and attempted suicides would have been prevented.

114. All of these unconstitutional customs, practices, and policies of HCDC are enabled and in force due to the supervisory authority of Sheriff Gahler and Warden Galbraith, which include, but are not limited to:

   a. placing at-risk detainees/pretrial detainees on twenty-three (23) hour isolation;

   b. failing to enforce or enact proper treatment, evaluation, screening, and observation mechanisms for at-risk detainees;

   c. failing to modify, remove, or alter the active ligature points that exist in every cell of HCDC.

**Biased Investigations**

115. All of the aforementioned unconstitutional customs, practices, and policies are further facilitated, perpetrated, enabled, and remain in force due to the practice of how suicide attempts, successful or otherwise, are investigated within HCDC.

116. HCDC is entirely staffed, operated, and overseen by the Harford County Sheriff's Office.

117. Every oversight investigation into an incident of self-harm at the facility is conducted by the Harford County Sheriff's Office. Upon information and belief, no independent law enforcement agency has, in the time period referenced in this Complaint, _ever_ investigated any incident of self-harm in HCDC.

118. This manner of investigation presents a conflict of interest. HCSO investigators have an interest in serving the HCSO, whose supervisory authority HCDC falls under. This interest _prevents the HCSO from making objective determinations_ during their investigations, which leads to biased conclusions.

119. Such biased conclusions work to exculpate HCDC and/or its staff from any of the wrongdoing/liability that has contributed to the self-harm epidemic in the facility.

120. Had objective investigations occurred, it is more likely than not that at least some, if not all, of the dangerous customs, policies, and practices of HCDC would have been exposed. Had they been exposed, it is more likely than not that changes would have been implemented, suicides would have been prevented, and lives would have been saved.

121. Biased conclusions detracting from HCDC's liability for detainee self-harm is not speculative or hypothetical. Examples in HCSO's own records depict this bias. Examples include:

a.    The HCSO investigation into Randy Craig's Gisiner's suicide noted that he had been placed on <u>suicide watch</u> upon entering the facility, eight days prior to his attempt.  However, the investigation report nevertheless stated was that there were "*no signs that detainee Gisiner was distressed or upset about anything.*"

b.    The HCSO investigation into Jack Lazar's suicide noted that he had been transported to a nearby hospital twice in the days leading up to his self-harm for medical/psychological reasons, and that on the day before his death he was taken to the HCDC medical unit for medical/psychological reasons.  The investigation further noted that Mr. Lazar had been distressed and unable to contact his family while he was detained at HCDC.  However, the investigation report nevertheless stated that "*there were no indicators/evidence that would have explained why detainee Lazar would have wanted to harm himself.*"

c.    The HCSO investigation into Nathaniel Powell's death <u>omitted and mischaracterized</u> facts pertinent to his self-harm attempt.  It also failed to make any meaningful inquiry into the incident.

d.    First, the investigation report noted that Mr. Powell Jr. had a "routine psychological evaluation" for his mental health scheduled for Monday, January 23, 2023.  The HCSO investigation report asserts that the appointment was "standard procedure" within the facility.  This is at most a half-truth.  According to HCDC's own records, the "routine psychological evaluation," was in fact a follow-up appointment to Mr. Powell Jr.'s "urgent referral" to mental health counselor Ms. Himmler.

e.    When Mr. Powell Jr. came into HCDC on January 18, 2023, his initial screening noted he was heavily detoxing from opiates, benzodiazepine, and alcohol.  It

33

also notes he was experiencing depression, anxiousness, concerns about coping with his incarceration, PTSD, and had friends/family who had committed/attempted to commit suicide. As a result of this screening, NP Dougherty recommended an "urgent referral" to Mental Health Counselor Ms. Himmler. Ms. Himmler then met with Mr. Powell Jr. on that same day, discussed with him the detox protocol, and scheduled a follow up appointment to occur within five (5) days after this "urgent referral" regarding his mental health. *Any* medical appointment scheduled to occur in five (5) or more days is characterized "routine" according HCDC medical record keeping policy. However, this "routine" follow up appointment was <u>not</u> "standard procedure" within the facility and was particular to Mr. Powell Jr.'s mental health treatment. The investigation report's allusion to the contrary is a mischaracterization.

f.      Further, this "urgent referral" was never mentioned in the HCSO's investigation report. Neither was the fact that Mr. Powell Jr. was known to be actively detoxing, depressed, and anxious. Instead, the report stated that "Nathaniel was taking ibuprofen and medication for nausea but has *no other apparent medical history*." Mr. Powell Jr.'s HCDC medical records contradict this assertion.

g.      The report goes on to assert that "according to staff, Nathaniel made no suicidal or other concerning statements during [his brief detention in HCDC]." While it is unknown if Mr. Powell Jr. made any suicidal statements during his time in HCDC, his statements were nevertheless deemed "concerning" enough to receive an "urgent referral" to a mental health counselor, Ms. Himmler.

h.      Specifically, the HCSO investigator interviewed NP Dougherty, who stated that Mr. Powell Jr. "did not portray any indication that he may harm himself." This

34

statement is contrary with HCDC policy regarding suicide prevention, which warns that substance detoxification and depression are <u>key indicators</u> in identifying and preventing detainee suicide. NP Dougherty personally observed the aforementioned key indicators of self-harm in Mr. Powell Jr. and soon after made the "urgent referral" to Ms. Himmler. Correctional staff charged with the observation and custody of Mr. Powell ignored these warning signs.

122.    The above examples demonstrate that HCSO investigation narratives into HCDC incidents of self-harm have often directly contradicted the reality of matters investigated. These contradictions are intentional to conceal HCDC wrongdoing, and/or the investigations are so profoundly unthorough that the truth is not discovered. Regardless of the manner in which these investigations failed in fact finding, the reason why they failed is clear—<u>bias</u>.

123.    When a death occurs in the HCDC, the same entity which is responsible for its operation, staffing, and oversight, the Harford County Sheriff's Office, conducts the investigation. This is a direct conflict of interest which has direct and apparent consequences, which include, but are not limited to, omissions of key facts, mischaracterizations of narrative, and conclusions that deviate from reality.

124.    As a direct and proximate result of these omissions, mischaracterizations, and deviations, the nature and causes of the self-harm epidemic in HCDC have remained *hidden*.

125.    If independent law enforcement investigations had been conducted into the self-harm incidents at HCDC, it is more likely than not that the aforementioned problems which contribute to their unconstitutional/dangerous patterns and practices would have been exposed. Had these problems been exposed, it is more likely than not that these patterns and practices would been altered, amended, or modified. Had these patterns and practices been altered,

35

amended, or modified, it is more likely than not that lives would have been saved, and both attempted and successful suicides would have been prevented.

126. As a direct and proximate result of HCSO's biased investigations, the unconstitutional customs, practices, and policies which already posed danger to the lives of detainees have been continuously facilitated and enabled.

127. For the reasons outlined above, including, but not limited to, by virtue of Defendant County's legal, practical, and financial control over the Detention Center and designation of the Sheriff to manage such functions, Sheriff Gahler is the final repository of Defendant County authority for the Harford County Detention Center. Accordingly, Sheriff Gahler has a duty to ensure that HCDC maintains customs, practices, and polices, which protect detainees from known dangers while housed within the HCDC facility, a duty to ensure HCDC operates within constitutional bounds, and a duty to discipline, fire, and/or *investigate* HCDC staff member who fail to conduct their duties adequately, constitutionally, or lawfully.

128. Sheriff Gahler breached this duty by failing to ensure that constitutional customs, practices, and policies were in place at HCDC, and by failing to ensure both HCDC staff were properly trained to conduct their respective HCDC duties within constitutional bounds, and proscribed policy/regulations, and by failing to discipline, fire, and/or investigate matters of unconstitutional wrongdoing by HCDC staff.  These failures led Deputy Oleszczuk and other HCDC staff to believe they did not need to conduct their HCDC duties within constitutional bounds to protect detainees from known dangers.

**The Result of the Pattern and Practices of the Harford County Detention Center**

129. As a direct and proximate of Sheriff Gahler's negligence, gross negligence, deliberate indifference, intentional conduct, and/or malicious conduct, Mr. Powell Jr. suffered

significant pain and suffering, including, but not limited to, suffocation, panic, and ultimately loss of life.  Plaintiffs have also suffered severe emotional pain and suffering, including, but not limited to, grieving over the preventable loss of Mr. Powell Jr.'s life, loss of sleep, anxiousness, extreme sadness, and loss of enjoyment of life, as well as significant economic damages.

130.    Plaintiffs further allege that all of their own, and Mr. Powell Jr.'s, injuries, losses, and damages related to this incident, were caused solely by the actions of Sheriff Gahler, as set forth above, without any negligence, want of due care, or provocation on the part of Mr. Powell Jr., either directly or indirectly.

131.    Sheriff Gahler's acts were a foreseeable cause of the injuries sustained by Mr. Powell Jr. and Plaintiffs.

132.    At all times relevant hereto, Sheriff Gahler subjected Mr. Powell Jr. to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

133.    Sheriff Gahler's conduct, actions, and inactions, as well as those stated elsewhere herein, subjected Mr. Powell Jr. to deprivation of his constitutional rights and privileges.

134.    Defendant County is liable for Sheriff Gahler's actions/inactions in this case.

135.    All the allegations herein, however worded, are pleaded alternatively as acts of negligence, gross negligence, intent, and/or malice, as determined at trial by the jury in this matter.

**COUNT I**
**CIVIL RIGHTS ACT 42 U.S.C. § 1983**
*Monell* **Unconstitutional Pattern or Practice**

136.    Every paragraph not falling under this Count is incorporated herein by reference.

137.    Sheriff Gahler/Defendant County had a duty to ensure that HCDC maintains customs, practices, and polices, which protect detainees from known dangers while housed within the HCDC facility, a duty to ensure HCDC operates within constitutional bounds, and a duty to discipline, fire, and/or *investigate* HCDC staff member who fail to conduct their duties adequately, constitutionally, or lawfully.

138.    Sheriff Gahler's/Defendant County's pattern and practice of 1) routinely placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen evaluate, and observe at-risk detainees; and/or 3) failing to remove known ligature points within HCDC cells, directly and proximately caused the deprivation of constitutional rights, including under the Civil Rights Act (as set forth herein), deprivation of liberty, and freedom from abuse of power, and represents not a single isolated, accidental or peculiar event, but occurrences in the regular procedures followed by these HCDC employees, and thus constitutes a pattern or practice of such conduct.

139.    Prior to the date of this incident, Sheriff Gahler/Defendant County permitted and tolerated a pattern and practice of unjustifiably, unreasonably, and unlawfully 1) placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen, evaluate, and/or observe at-risk detainees; and/or 3) failing to remove known ligature points within HCDC cells.

140.    Sheriff Gahler's/Defendant County's widespread knowledge of, and out-right participation in, 1) placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen evaluate, and observe at-risk detainees; and/or 3) failing to remove known ligature points within HCDC cells, in violation of citizen's rights constitutes as being an unconstitutional pattern or practice of improper conduct.

141.    In addition, Sheriff Gahler/Defendant County cause their employees to believe that unjustifiably, unreasonably, and unlawfully 1) placing at-risk detainees arbitrarily on isolation; 2) failing to adequately treat, assess, screen evaluate, and observe at-risk detainees; and/or 3) failing to remove known ligature points within HCDC cells would not be aggressively, honestly, and properly investigated.

142.    Sheriff Gahler/Defendant County should have foreseen that such a policy would promote the proliferation of constitutional violations of detainees' rights.

143.    Sheriff Gahler/Defendant County have instituted and maintained formal and informal customs, policies, and practices that foster, promote and encourage employees to violate the rights of citizens.

144.    This is a result of Sheriff Gahler's/Defendant County's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when found to have occurred.  As a result of this failure, there has been a regular pattern and practice of conduct similar to that complained of here.  This pattern and practice has been manifested in other prior incidents against Defendant County.

145.    Sheriff Gahler/Defendant County have failed and refused to take even elementary steps to protect citizens from the type of abuses detailed above.

146.    The policies and customs of Sheriff Gahler/Defendant County as set forth herein, demonstrates a gross disregard for the constitutional and other rights of the public and Plaintiffs. At the time of the occurrence alleged in this Complaint, Sheriff Gahler/Defendant County were operating under unconstitutional customs, policies, and procedures.  These customs, policies, and procedures were a proximate cause of the injuries to Plaintiffs.

147.	As a direct and proximate result of the aforesaid acts, omissions, systemic flaws, policies, and customs of Sheriff Gahler/Defendant County, Plaintiffs were deprived of their rights under the Constitution of the United States, as detailed above.

148.	In sum, the execution of the policy or custom of Sheriff Gahler/Defendant County inflicted injury upon Plaintiffs.

149.	Plaintiffs plead in the alternative that Sheriff Gahler/Defendant County acted at all relevant times with negligence, gross negligence, intent and/or malice.

150.	As a direct and proximate result of Sheriff Gahler's/Defendant County's actions, Mr. Powell Jr. suffered significant physical pain and suffering, including, but not limited to, suffocation, panic, and, ultimately, loss of life.  Plaintiffs have also suffered severe emotional pain and suffering, including, but not limited to, grieving over the preventable loss of Mr. Powell Jr.'s life, loss of sleep, anxiousness, extreme sadness, and loss of enjoyment of life, as well as significant economic damages.

151.	All duties to the decedent and the plaintiffs which were breached as described herein were non-delegable duties of the County.

WHEREFORE, Plaintiffs demand judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## JURY DEMAND

Plaintiffs demand a jury trial as to all claims so triable.

40

Respectfully submitted,

HANSEL LAW, P.C.

_/s/ Kristen Mack_

Cary J. Hansel (Bar No.: 14722)
Kristen M. Mack (Bar No.: 30349)
2514 North Charles Street
Baltimore, Maryland 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
cary@hansellaw.com
kmack@hansellaw.com
*Counsel for Plaintiffs*

41